**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOHN ANTHONY, individually and on behalf of all others similarly situated,    ) ) ) | |

JOHN ANTHONY, individually and on behalf
of all others similarly situated,    )
    )
    )   Civil Action No.  2:21-cv-1034
    Plaintiff,    )
    )
    v.    )
    )   CLASS ACTION
KONINKLIJKE PHILIPS N.V., PHILIPS   )
NORTH AMERICA LLC, and PHILIPS RS   )   JURY TRIAL DEMAND
NORTH AMERICA LLC,    )
    )
    Defendants.    )
    )

## COMPLAINT

Plaintiff John Anthony individually and on behalf of all others similarly situated, by and through his attorneys, alleges as follows:

## I.    NATURE OF THE ACTION AND INTRODUCTION

1.    This is a class action lawsuit brought against Defendants Koninklijke Philips N.V., Philips North America LLC, and Philips RS North America LLC (collectively "Philips" or "Defendants") by Plaintiff individually and on behalf of all other similarly situated consumers who purchased certain CPAP/BiPAP machines or ventilators manufactured and sold by Defendants.

2.    Philips manufactures and sells medical equipment products. These products include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are used in the treatment of sleep apnea, and ventilators, which treat respiratory failure.

3.    On June 14, 2021, Philips announced a recall of many of its CPAP/BiPAP machines and its ventilators because they suffer from a defect which could result in serious injury, permanent impairment, and even be life-threatening.

4. These products contain polyester-based polyurethane ("PE-PUR") foam which is used to minimize the sound produced by the devices. According to Philips, this PE-PUR foam can deteriorate over time, causing it to break down. When the foam breaks down, small foam particles and gases can be inhaled or ingested though use of the devices which assist patients with respiration. The foam may emit volatile organic compounds, which when inhaled, can result in serious adverse health effects, including cancer.

5. Unfortunately for patients, Philips has known about these dangers for years but did nothing to warn patients or doctors until recently.

6. Furthermore, despite the recall, Philips is still not actually repairing or replacing affected devices, which many patients rely upon on a daily basis to treat serious medical conditions. Since Philips is now telling patients it is not safe to use these devices, but many patients rely on them to treat serious health conditions, Philips leaves many patients with no safe option but to pay full price for a newer version.

7. Plaintiff purchased a Philips device included in the recall. Plaintiff would not have purchased the device or would have paid less for it if he had known about the foam problems and potential health hazards.

8. As a result of Philips's unfair, deceptive, and/or fraudulent business practices, owners of these devices, including Plaintiff, have suffered an ascertainable loss, injury in fact, and otherwise have been harmed by Philips's conduct.

## II.  THE PARTIES

### A.  PLAINTIFF JOHN ANTHONY

9. Plaintiff John Anthony is a citizen and resident of Pennsylvania.

10. Plaintiff began using a DreamStation CPAP machine in the Spring of 2021.

11.     Plaintiff was supposed to use his CPAP machine nightly to treat his sleep apnea and did so prior to learning of the recall.

12.     Plaintiff is now afraid to use his machine because of the health dangers described in Philips's recall.

13.     Plaintiff, however, is also concerned about the health dangers associated with not using a CPAP machine at night.

14.     Plaintiff will likely have to purchase a brand-new machine at full price.

15.     Plaintiff would not have purchased the DreamStation machine if he had known it was defective. Plaintiff seeks a refund, reimbursement for the replacement, and all other appropriate damages for all the injuries he has suffered as a result of his defective DreamStation.

**B.    DEFENDANTS**

16.     Koninklijke Philips N.V. is a Dutch multinational company headquartered in Amsterdam, Netherlands, and is the parent company of Philips North America LLC and Philips RS North America LLC.

17.     Defendant Philips North America LLC is a Delaware company with its principal place of business in Cambridge, Massachusetts.

18.     Defendant Philips RS North America LLC (formerly Respironics, Inc.) is a Delaware company with its headquarters and principal place of business in Murrysville, Pennsylvania.

19.     The name "Respironics Inc." and Philips RS's Murrysville, PA address is printed on the bottom of Plaintiff's DreamStation machine.

20.     At all relevant times, each Defendant acted in all aspects as the agent and alter ego of each other, and reference to "Philips" or "Defendants" herein refers to each and every Defendant individually and collectively.

## III.    JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

22.     Venue is proper because Philips RS North America LLC (formerly Respironics, Inc.) is headquartered in and regularly conducts business in this District and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    CPAP AND BIPAP MACHINES AND VENTILATORS

23.     CPAP and BiPAP machines and ventilators are all used to treat serious respiratory conditions by helping patients to breathe.

24.     CPAP and BiPAP machines are used primarily as treatment for sleep apnea.

25.     Sleep apnea (sometimes called obstructive sleep apnea) is a disorder in which breathing is disturbed temporarily during sleep. Breathing may stop or become very shallow. These periods are called "apneas," and they may be associated with fatigue, daytime sleepiness, depression, interrupted sleep, or snoring, among other symptoms. Serious cases can lead to hypertension, heart attack, or stroke, among other medical ailments. It is estimated that over 25 million Americans suffer from sleep apnea.[1]

---

[1] *See* The American Academy of Sleep Medicine, *Rising prevalence of sleep apnea in U.S. threatens public health*, available at https://aasm.org/rising-prevalence-of-sleep-apnea-in-u-s-threatens-public-health/ (last visited July 3, 2021).

26.    CPAP therapy is the most common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. According to the Mayo Clinic, "CPAP is the most consistently successful and most commonly used method of treating obstructive sleep apnea."

27.    BiPAP machines and Automatic Positive Airway Pressure (APAP) machines are similar devices that also treat sleep apnea. BiPAP machines use two different pressures, one for inhaling and one for exhaling. APAP machines adjust pressure automatically during the night as needed.

28.    CPAP, BiPAP and APAP machines all consist of a main unit which connects to a facemask via an air hose. A patient will typically place the main unit on a nightstand and then wear the mask in bed while sleeping.

29.    The following images show the general components and typical use of these machines:





30.    Sleep apnea patients typically use these machines every night when they sleep. Symptoms may return quickly without continued use.

31.    Unlike CPAP and BiPAP machines, ventilators (sometimes called mechanical ventilators or breathing machines) are used to treat respiratory failure.

32.    Respiratory failure is a condition in which a patient has difficulty breathing or getting enough oxygen into his or her blood. Many underlying conditions can cause respiratory failure, including physical trauma, sepsis, pneumonia, COVID-19, and drug overdose. Respiratory failure can be fatal.

33.    Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. The COVID-19 crisis has led to a significant increase in the demand for ventilators.

34.    A ventilator mechanically helps pump oxygen into a patient's body. The air flows through a tube that goes in the patient's mouth and down his or her windpipe.

35.    The following image from the National Institute of Health shows a typical ventilator and how it works:



**B.    <u>PHILIPS PRODUCTS</u>**

36.    CPAP and BiPAP machines and ventilators are big business. The global sleep apnea devices market size was valued at $3.7 billion in 2020 and is expected to expand considerably in the coming years.[2] The global ventilator market size was valued at $2.99 billion in 2019[3], which was before the COVID-19 pandemic created skyrocketing demand and global shortages.

37.    Philips is a major manufacturer of CPAP machines, BiPAP machines, and ventilators. Philips has sold millions of CPAP and BiPAP machines and ventilators in the United States.

---

[2]  *See*  https://www.grandviewresearch.com/industry-analysis/sleep-apnea-devices-market  (last visited July 3, 2021).
[3]  *See* https://www.alliedmarketresearch.com/mechanical-ventilators-market (last visited July 3, 2021).

38.     Philips's primary line of CPAP/BiPAP machine products is the DreamStation line. The original DreamStation launched in October 2015. Philips subsequently launched a more compact version which it advertises as ideal for travel called the DreamStation Go.

39.     The DreamStation products are among the bestselling sleep apnea devices on the market.

40.     Philips sells DreamStation products through its Western Pennsylvania based subsidiary, Respironics (now Philips RS North America LLC), which Philips acquired in 2008.

41.     Many of Philips's CPAP and BiPAP machines and ventilators contain PE-PUR foam in order to reduce sound made by the machine. As designed, air passes through this foam before it is pumped into the patient's airway. Some of the sound generated by the machine is then absorbed by the foam.

42.     Sound reduction can be an attractive feature since patients operate these devices while they (and their partners) are sleeping. In fact, the relative quiet of DreamStation products factors prominently into Philips's marketing.[4] Philips put out information that it extensively studied and measured the amount of sound produced by DreamStation products. For example, Philips put out the following infographic indicating DreamStation products are barely louder than a whisper:

---

[4] *See* https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf (last visited July 3, 2021).



43.    On April 13, 2021, Philips announced that it was launching a next-generation model of the DreamStation, called the DreamStation 2.

### C.    RECALL AND SERIOUS HEALTH RISKS

44.    On April 26, 2021, less than two weeks after it announced the launch of the second-generation, Philips announced the recall of first-generation DreamStation products due to concerns about serious health risks.

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone*), and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family.

45.    On June 14, 2021, Philips issued a further statement about the possible health risks stemming from deterioration of the PE-PUR foam:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods,

such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

46.     Philips further explained that it "has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects."

47.     On the same day, Philips also issued "Clinical information for physicians," which explained that the foam breakdown "may lead to patient harm and impact clinical care." Philips warned doctors that the following symptoms and health effects can result:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.

48.     Deterioration of the foam can release harmful chemicals into the air that the machines are pumping into patients' lungs, including toluene diamine, toluene diisocyanate, and diethylene glycol.

49.     The National Institute for Occupational Safety and Health categorizes toluene diisocyanate as "potential carcinogen." The European Union considers toluene diisocyanate "highly toxic" and has concluded that toluene diamine "cannot be considered safe for use."

50.     Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." The PE-PUR foam is black, and when it breaks down, it can release these particles into the airpath.

51.    Harmful gasses can also be released as the foam degrades, including dimethyl diazine and Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-.

52.    Philips admitted that these harmful substances can cause: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/ vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."

53.    Philips advised patients to stop using affected CPAP and BiPAP machines immediately because of the potential health risks.

54.    The statement also acknowledged that it may be too dangerous for patients using affected ventilators to stop using them and more or less advised doctors to decide whether it was more dangerous to take the patient off the ventilator or to leave the patient on the defective ventilator.

55.    The products affected by the recall include ("Recalled Products"):

- E30
- DreamStation ASV
- DreamStation ST, AVAPS
- SystemOne ASV4
- C Series ASV, S/T, AVAPs
- OmniLab Advanced Plus
- SystemOne (Q Series)
- DreamStation CPAP, Auto CPAP, BiPAP
- DreamStation Go CPAP, APAP
- Dorma 400, 500 CPAP
- REMStar SE Auto CPAP
- Trilogy 100 and 200

- Garbin Plus, Aeris, LifeVent
- A-Series BiPAP Hybrid A30
- A-Series BiPAP V30 Auto
- A-Series BiPAP A40
- A-Series BiPAP A30

56.     Philips acknowledged that most of the devices it was recalling are still within the "advised 5-year service life" of the products.

57.     Philips has admitted that the recalled products are defective and unsafe and that patients should stop using them immediately. Although still within what was supposed to be their useful life, these products are now effectively useless.

58.     Had Plaintiff and Class Members known about the defect and health risks, they either would not have bought these products or would have paid significantly less for them. Plaintiff and Class Members have all suffered economic injuries as a result of their purchase of Philips CPAP and BiPAP machines and ventilators.

> **D.**     **PHILIPS KNEW ABOUT THE DEFECT LONG BEFORE ISSUING THE RECALL**

59.     Although Philips did not disclose these health risks to its consumers or the general public until 2021, Philips knew about these health risks much earlier.

60.     As noted above, when Philips announced the recall, it acknowledged it had already received complaints about black particles in the airways of the machines. The DreamStation line first launched in 2015, and several of the affected models have been on the market even longer.

61.     Online message boards, review sites, and social media contain many complaints regarding black particles and foam degradation problems. Philips, like most companies, likely monitors these online forums and would have learned about the problem years ago.

62.     For example, Nick Dunn, who runs the YouTube channel "CPAP Reviews," reported as soon as the recall was announced that he had known about the foam issues for several years because he monitors message boards and social media about CPAP machines.

63.     The following are just a sampling of the online complaints.

64.     In 2018, the user "trickyneedsleep" reported on apneaboard.com that, using the DreamStation Auto, the filters turned black within three days of use.

65.     In 2019, the user "WSHenry" reported on apneaboard.com in a thread entitled "DreamStation Filter Contamination" that "both the pollen and ultra-fine filters in my machine were clogged with black (Carbon?) particles. I also noted that water chamber was completely dry. There were odd odors noted, and the water chamber was undamaged." He explained that he had recently cleaned the filters and that "[t]here was only a small amount of dust on the furniture, and the machine and tubing is clean. I do not burn candles nearby, and the furnace is off. I do have the window slightly opened, as is the case nearly year-round." He asked: "Is it possible the contamination is from the blower?"

66.     In 2019, the user "Skogcat1" reported on apneaboard.com in a thread entitled "Black sticky dust in CPAP machine" that, when using the REMStar Auto, there were "sticky black dust particles" in the humidifier chamber.

67.     In September 2020, Carol Nickerson posted on Facebook that she found a black mold-like substance in the water reservoir of her Philips DreamStation.

68.     In June 2021, shortly after the recall was announced, on a Reddit thread entitled "Dreamstation Foam, user "BOSSHOG999" posted: "I was wondering what the hell those black particles were in my tube."

69.    In addition to consumer complaints, Philip should have known about the foam problems from its prerelease testing. Medical devices go through considerable testing and design prior to release to the public.

70.    As noted above, Philips's own marketing dating back to at least 2017, indicates it considered and studied the foam and noise reducing abilities extensively when designing the product.[5]

71.    Furthermore, Philips already claims to know that the second-generation DreamStation 2, which it launched just before the recall, is free from the foam degradation defect. This strongly suggests that Philips was aware of and looked at the issue when developing the DreamStation 2.

72.    Despite knowing about the foam deterioration defect and related health hazards for years, Philips did nothing to warn consumers, healthcare providers, or the public until very recently.

73.    Furthermore, although it has issued a "recall" of the affected products, Philips is not actually repairing or replacing them. Philips has indicated it may take over a year before it can start repairing or replacing consumers' devices. Instead, Philips is using this as an opportunity to encourage consumers to buy its second-generation products (at full price).

74.    Unfortunately for patients who need to use these devices every day to stave off serious health problems, waiting over a year for Philips to offer some sort of repair is not a realistic option.

---

[5] *See* https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf (last visited July 3, 2021).

75.     Providing a pre-suit demand to Philips would be futile given their actions to date, including the recall, and the fact that other lawsuits have already been filed.

## V.      EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

76.     The running of any statute of limitations has been equitably tolled by reason of Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiff and Class Members the true risks associated with the Recalled Products.

77.     As a result of Defendants' actions, Plaintiff were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been exposed to the risks and harms set forth herein and that those risks and harms were the direct and proximate result of Defendants' acts and omissions

## VI.     CLASS ALLEGATIONS

78.     This action is brought, and may properly proceed, as a class action, pursuant to Rule 23(a) and 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks certification of a Class defined as follows ("Nationwide Class"):

> **Nationwide Class:** All persons in the United States who have purchased a Recalled Product other than for resale.

In addition, or in the alternative, Plaintiff seeks certification of the following State Class:

> **Pennsylvania Class:** All persons in Pennsylvania who have purchased a Recalled Product other than for resale.

79.     Excluded from the Class is Philips, its affiliates, employees, officers and directors, and the Judge(s) assigned to this case.  Plaintiff reserves the right to modify, change, or expand the class definitions if discovery and/or further investigation reveal that they should be expanded or otherwise modified.

80.     The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions and meet the requirements for a class action under Rule 23:

a.      **Numerosity**: Members of the Class are so numerous that their individual joinder is impracticable. Plaintiff are informed and believe that the proposed Class contains at least millions of individuals. The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class numbers is unknown to Plaintiff at this time, but the Class members are readily ascertainable and can be identified by Defendants' records.

b.      **Existence and Predominance of Commons Questions of Fact and Law**: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.      Whether the Recalled Products fail under the implied warranty of usability;

ii.     Whether Defendants were unjustly enriched by the sale of Recalled Products;

iii.    Whether Defendants were negligent in selling the Recalled Products;

iv.     Whether Defendants failed to warn consumers regarding the risks of the Recalled Products

v.      Whether Defendants' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

vi.     The appropriate nature of class-wide equitable relief; and

vii.    The appropriate measurement of restitution and/or measure of damages to Plaintiff and members of the Class.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.      **Typicality**: Plaintiff's claims are typical of the claims of all members of the Class who purchased the Recalled Products for personal use.

d.      **Adequacy**: Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class that he seeks to represent; he has retained counsel competent and highly experienced in complex class action litigation and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

e.      **Superiority**: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiff and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## VII.    CAUSES OF ACTION

### COUNT I
### BREACH OF THE IMPLIED WARRANTY OF USABILTIY

81.     Plaintiff and the Class incorporate by reference all preceding paragraphs.

82.     By operation of law, Defendants, as manufacturers of the Recalled Products and as the providers of a limited warranty for the Recalled Products, impliedly warranted to Plaintiff and the Class that the Recalled Products were usable for their ordinary and intended use.

83.     Defendants breached the implied warranty of usability in connection with the sale and distribution of the Recalled Products. At the point of sale, the Recalled Products while appearing normal—contained defects as set forth herein rendering them unusable.

84.     Defendants, their agents and their employees knew or should have known that the Recalled Products suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

85.     Defendants' recall announcement instructs Class Members to not use Recalled Products because of the health risks. This renders the products unusable and thus worthless.

86.     Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were usable for their ordinary and intended use.

87.     Had Plaintiff and Class Members known they would not be able to use their Recalled Products, they would not have purchased them or would have paid significantly less for them.

88.     As a direct and proximate result of Defendants' breach of the implied warranty of usability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

89.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

90.    By operation of law, Defendants, as manufacturers of the Recalled Products and as the providers of a limited warranty for the Recalled Products, impliedly warranted to Plaintiff and the Class that the Recalled Products were of merchantable quality and safe for their ordinary and intended use.

91.    Defendants breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Products. At the point of sale, the Recalled Products while appearing normal—contained defects as set forth herein rendering them unsuitable and unsafe for personal use.

92.    Had Plaintiff and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

93.    Defendants have refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

94.    As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT III
## BREACH OF EXPRESS WARRANTY

95.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

96.     Defendants warranted the Recalled Products "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."

97.     Defendants breached this express warranty in connection with the sale and distribution of Recalled Products. At the point of sale, the Recalled Products while appearing normal—contained immediate defects as set forth herein, rendering them unsuitable and unsafe for personal use.

98.     Had Plaintiff and the Class known the Recalled Products were unsafe for use, they would not have purchased them.

99.     Defendants have breached their warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Products. Plaintiff and the Class reasonably expected, at the time of purchase, that the Recalled Products were safe for their ordinary and intended use.

100.    As a direct and proximate result of Defendants' breach of their express warranty, Plaintiff and the Class have sustained damages in an amount to be determined at trial.

## COUNT IV
## STRICT LIABILITY-FAILURE TO WARN

101.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

102.    Defendants had a duty to warn Plaintiff and the Class members regarding the defect and true risks associated with the Recalled Products.

103.    Defendants failed to provide adequate warnings regarding the risks of the PE-PUR foam.

104.    Defendants had information regarding the true risks but failed to warn Plaintiff, Class members, and their physicians to strengthen their warnings.

105.    Despite Defendants' obligation to unilaterally strengthen the warnings, Philips instead chose to actively conceal this knowledge.

106.    Plaintiff and Class Members would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known the defect and risks of purchasing the product.

107.    This defect proximately caused Plaintiff's and Class members' injuries which include economic injuries, as well as headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

108.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

**COUNT V**
**DESIGN DEFECT STRICT LIABILITY**

109.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

110.    The design of the Recalled Products, including but not limited to design and use of the foam and the placement of the foam within the Recalled Product, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, which may cause headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

111.    The design of the Recalled Products and the foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

112.    The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous.  Indeed, there are other CPAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation DreamStation machines.

113.    Safer, alternative machines from other manufactures were available that did not suffer from the defects as set forth herein and did not have an unreasonable risk of harm as with the Recalled Products and their unsafe foam.

114.    The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

115.    The Recalled Products did not perform as an ordinary consumer would expect.

116.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VI
## NEGLIGENT FAILURE TO WARN

117.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

118.    Defendants owed Plaintiff and Class Members a duty of care and to warn of any risks associated with the Recalled Products. Defendants knew or should have known of the true risks but failed to warn Plaintiffs, Class members, and their doctors.

119.    Defendants' negligent breach of duty caused Plaintiff and Class members economic damages and injuries in the form of headache, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects

120.    Plaintiff and Class members would not have purchased, chosen, and/or paid for all or part of the Recalled Products had they known that the risks associated with purchasing the product.

121.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VII
## NEGLIGENT DESIGN DEFECT

122.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

123.    Defendants negligently designed the Recalled Products. Philips owed Plaintiff a

duty to design the Recalled Products in a reasonable manner. The design of the Recalled Products, including but not limited to design of the foam and the placement of the foam within the Recalled Product, was defective and unreasonably dangerous, causing degradation and inhalation of the foam, and causing headaches, irritation, inflammation, respiratory issues, and exposure to materials with toxic and carcinogenic effects.

124.    The design of the Recalled Products and the foam rendered the Recalled Products not reasonably fit, suitable, or safe for their intended purpose.

125.    The dangers of the Recalled Products outweighed the benefits and rendered the products unreasonably dangerous.  Indeed, there are other CPAP and other machines that do not use a similarly toxic foam that is subject to degradation, inhalation, and ingestions, such as Defendants' next-generation DreamStation machines.

126.    Safer, alternative machines from other manufactures were available which did not have an unreasonable risk of harm as with the Recalled Products and their unsafe foam.

127.    The risk benefit profile of the Recalled Products was unreasonable, and the products should have had stronger and clearer warnings or should not have been sold in the market.

128.    The Recalled Products did not perform as an ordinary consumer would expect.

129.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## COUNT VIII
## NEGLIGENT RECALL

130.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

131.    In issuing a voluntary recall, Philips assumed duties to Plaintiff and the Class to exercise reasonable care in issuing and implementing the recall.

132.    Philips breached its duties by failing to adequately warn Plaintiff and the Class of the dangers associated with the use of the Recalled Products by refusing to promptly repair or replace the Recalled Products.

133.    As a direct result of Defendants' breach of duty, Plaintiff and the Class have suffered harm in an amount to be determined at trial.

**COUNT IX**
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE**
**PRACTICES AND CONSUMER PROTECTION LAW ("PENNSYLVANIA UTPCPL")**
**On Behalf of the Pennsylvania Class**

134.    Plaintiff brings this action on behalf of the Pennsylvania Class.

135.    Plaintiff incorporates each paragraph herein as if it is fully set forth herein.

136.    Plaintiff and the Pennsylvania Class purchased or leased their Recalled Devices primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

137.    All of the acts complained of herein were perpetrated by Philips in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

138.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, ….Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

139.    Philips engaged in unlawful trade practices, including representing that the Recalled Devices have characteristics, uses, benefits, and qualities which they do not have; representing that the Recalled Devices are of a particular standard and quality when they are not; advertising the

Recalled Devices with the intent not to sell them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

140.    In the course of its business, Philips knowingly sold the Recalled Devices with the defects and actively concealed defects, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Philips also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Recalled Devices.

141.    Philips has known that the Recalled Devices were defective for years but concealed their knowledge and took measures to hide the defect, and all the while they have represented to their customers and consumers that their Recalled Devices were fit and safe for their intended use.

142.    Philips was also aware and consciously decided to value profits over its customers' satisfaction and use of the Recalled Devices, and Philips knew they were manufacturing, selling and distributing the Recalled Devices throughout the United States that had serious safety defect.

143.    By failing to disclose and by actively concealing the defect and the true nature of the Recalled Devices, by marketing the Recalled Devices as safe and effective, Philips engaged in unfair and deceptive business practices in violation of the Pennsylvania UTPCPL.

144.    In the course of Philips' business, they willfully failed to disclose and actively concealed the defect, and Philips compounded the deception by repeatedly asserting that the Recalled Devices were safe and effective and claiming to be a reputable manufacturer that remedied defects and stood behind their products once they were in the hands of the Class.

145.    Philips' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Pennsylvania Class, about the true nature of the

Recalled Devices, the quality of the Philips brand, the devaluing and ultimate recall of the Recalled Devices.

146.    Philips intentionally and knowingly misrepresented material facts regarding the Recalled Devices with an intent to mislead Plaintiff and the Pennsylvania Class.

147.    Philips knew or should have known that their conduct violated the Pennsylvania UTPCPL.

148.    As alleged above, Philips made material statements about the Recalled Devices and the Philips brand that were either false or misleading.

149.    Philips owed Plaintiff and the Pennsylvania Class members a duty to disclose the true nature of the Recalled Devices because Philips:

a.   Possessed exclusive knowledge of the defect, and that they were manufacturing, selling and distributing Recalled Devices throughout the United States that had a latent defect;

b.   Intentionally and actively concealed the foregoing from Plaintiff and the Pennsylvania Class; and/or

c.   Made incomplete representations about the defect while purposefully withholding material facts from Plaintiff and the Pennsylvania Class that contradicted these representations.

150.    Because Philips fraudulently concealed the defect which ultimately resulted in a Recall notice, the Recalled Devices are now worth nothing.

151.    Philips' fraudulent selling of the Recalled Devices and their concealment of the true characteristics of defect were material to Plaintiff and the Pennsylvania Class.

152.    Plaintiff and the Pennsylvania Class suffered ascertainable loss caused by Philips' misrepresentations and its concealment of and failure to disclose material information.

153.    Philips had an ongoing duty to all Philips customers to refrain from unfair and deceptive acts or practices under the Pennsylvania UTPCPL. The Class suffered ascertainable loss in the form of the diminished value of their Recalled Devices as a result of Philips' deceptive and unfair acts and practices that occurred in the course of Philips' business.

154.    Philips violations, and failure to adequately recall the Recalled Devices, present a continuing risk to Plaintiff and the Pennsylvania Class as well as to the general public. Philips' unlawful acts and practices complained of herein affect the public interest.

155.    As a direct and proximate result of Philips' violations of the Pennsylvania UTPCPL, Plaintiff and the Pennsylvania Class have suffered injury-in-fact and/or actual damage.

156.    Philips is liable to Plaintiff and the Pennsylvania Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiff and the Pennsylvania Class are also entitled to an award of punitive damages given that Philips' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT X
## UNJUST ENRICHMENT
### In the Alternative

157.    Plaintiff and the Class incorporate by reference all preceding paragraphs.

158.    Plaintiff and the Class members conferred a tangible and material economic benefit upon Defendants by purchasing the Recalled Products. Plaintiff and Class members would not have purchased, chosen and/or paid for all or part of Recalled Products had they known that they the true risks of using the Recalled Products while Defendants cannot provide a timely repair or replacement for the Recalled Products. Under these circumstances, it would be unjust and

inequitable for Defendants to retain the economic benefits they received at the expense of Plaintiff and the Class.

159.    Failing to require Defendants to provide remuneration under these circumstances would result in Defendants being unjustly enriched at the expense of Plaintiff and the Class members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

160.    Defendants' retention of the benefit conferred upon them by Plaintiff and the Class would be unjust and inequitable.

161.    Plaintiff and the Class suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff request, individually and on behalf of the Class, that this Court:

A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and State Class defined above, and designate Plaintiff as the class representative and Plaintiff's counsel as counsel for the Nationwide Class and State Classes;

B.    award equitable and injunctive relief, including but not limited to, requiring Defendants to institute a medical monitoring program for Class members, restitution, and disgorgement of profits;

C.    award all actual, general, special, incidental, punitive, and consequential damages to which Plaintiff and Class members are entitled;

D.    award pre-judgment and post-judgment interest on such monetary relief;

E.    award reasonable attorneys' fees and costs; and

F.    grant such further and other relief that this Court deems appropriate.

## JURY DEMAND

Plaintiff and the Class demand a trial by jury on all issues so triable.

Dated: August 4, 2021                    Respectfully Submitted,


By: */s/ Alex M. Kashurba*
    Steven A. Schwartz (PA ID No. 50579)
    Benjamin F. Johns (PA ID No. 201373)
    Alex M. Kashurba (PA ID No. 319003)
    **CHIMICLES SCHWARTZ KRINER &**
    **DONALDSON-SMITH LLP**
    361 W. Lancaster Avenue
    Haverford, PA 19041
    Tel: 610-642-8500
    Fax: 610-649-3633
    sas@chimicles.com
    bfj@chimicles.com
    amk@chimicles.com


    Natalie Finkelman Bennett
    (*pro hac vice* to be filed)
    James C. Shah (*pro hac vice* to be filed)
    **MILLER SHAH LLP**
    1845 Walnut Street, Suite 806
    Philadelphia, PA 19103
    Tel: (610) 891-9880
    Fax: (866) 300-7367
    nfinkelman@millershah.com
    jcshah@millershah.com